SPARROW ET AL., APPELLEES, *v.* CITY OF COLUMBUS ET AL., APPELLANTS.

[Cite as Sparrow v. Columbus (1974), 40 Ohio App. 2d 453.]

(No. 73AP-456—Decided May 21, 1974.)

*Messrs. Taylor, Hultin & Ludwig, Mr. Charles E. Taylor* and *Mr. Jerry M. Hultin,* for appellees.

*Mr. James J. Hughes, Jr.,* city attorney, *Mr. Thomas A. Bustin* and *Mr. Robert A. Bell,* for appellant city of Columbus.

*Mr. William J. Brown,* attorney general, and *Mr. Harry Kandel,* for appellant state of Ohio.

TROOP, P. J. By a journal entry, filed November 19, 1973, the Court of Common Pleas of Franklin County permanently enjoined the city of Columbus, and the department of highways of the state of Ohio, "from using the two 15 foot strips of land on the north and south borders of East North Broadway for highway purposes until such time as the title to the land is no longer in the members of the plaintiffs' class or their successors in interest."

A notice of appeal was filed by the city of Columbus, November 23, 1973, addressed to this judgment. There are eight formal assignments of error offered in support of the appeal which call attention to constitutional provisions

and statutes which the appellant city urges were violated or ignored. The nub of the matter is, however, better and more simply expressed by what the city says is one of the issues present. Simply stated, but not so simply resolved, the question is: Does a county have authority to vacate a street, or a part thereof which is within the corporate limits of a chartered municipal corporation and is a part of its street system?

This is the starting point in this discussion which will include reference to the assignments of error, as necessary.

The street, the subject of present concern, was a part of Loren and Dennison's subdivision of lands in Clinton Township in Franklin County, which plat and subdivision was approved by the county commissioners November 18, 1890, and filed November 29, 1890, and is of record in plat book four, page 370, recorder's office, Franklin County, Ohio. The plat includes a street, East North Broadway, 100 feet wide extending from High Street east to the New York Central railroad tracks. The subdivision was called "Oakland." This name was changed to "North Broadway" by an amendment to the plat, duly approved, filed November 28, 1891, and recorded November 30, 1891. The trial court found that the city of Columbus annexed this subdivision in 1910, including East North Broadway, a 100-foot-wide dedicated street.

This controversy has its takeoff point in an action taken by the Franklin County Board of County Commissioners, in response to a petition filed by at least 12 freeholders of the vicinity asking that a strip of land 15 feet in width on either side of the 100-foot street, East North Broadway, be vacated. At a regular meeting on October 7, 1952, the commissioners, by an appropriate resolution, vacated the two strips of land as prayed for, providing that utilities installed in the strips were not affected. The proceedings appear to have been regularly completed, as shown by plaintiffs' exhibits five and seven and as officially recorded in Road Record Volume 17, page 249, in the office of the county engineer. No objection is raised as to the procedures noted.

A complaint was filed by Donald Sparrow and Danielle A. Warnes, as property owners and as representatives of a class of property owners owning property abutting East North Broadway, against the city of Columbus and the state of Ohio, its department of public works and its department of highways. A basic complaint recites the threatened taking of a portion of their premises—i. e., portions of the vacated 15-foot strips on either side of the street—without compensation. A temporary injunction was requested immediately and a permanent injunction is sought, after a hearing is held.

A preliminary injunction was issued May 21, 1971. Appropriate answers were filed to the complaint by the city of Columbus on June 1, 1971, and by the director of the department of highways of the state of Ohio on June 15, 1971.

On June 1, 1971, the city filed a motion for summary judgment under Civ. R. 56, with a supporting memorandum. A memorandum contra was filed June 23, 1971. There were no further filings, as authorized in subparagraph (C) of Civ. R. 56, supporting or opposing the city's motion for summary judgment. Notwithstanding, the trial court rendered its decision on the motion July 9, 1971. In that decision the court found the following:

"When the road was dedicated in 1891, a one hundred (100) foot strip was reserved. The area became part of the City of Columbus in 1910. In 1952, the County Commissioners, at the instance of the property owners, purported to vacate thirty (30) feet of this one hundred (100) foot right-of-way. The attorneys for the property owners apparently proceeded under Revised Code Section 5553.02, which specifically authorized the County Commissioners to vacate any road located within the County except the State Highway. No appeal was taken from such action. The county records were changed accordingly. The defendant City of Columbus, in its well prepared argument, cites statutory and constitutional provisions as supporting its proposition that the County Commissioners, in 1952, were without power to divest the City of Columbus, Ohio, of control. While

not ignoring such arguments, the Court believes that matters other than 'control' are at issue, such as actual ownership of the fifteen (15) foot strips in question."

The court overruled the motion for summary judgment, holding that "a full presentation of all the factual and legal issues" was necessary.

On July 15, 1971, the city, by motion, asked for a reconsideration. The memorandum supporting the motion had an affidavit of the clerk of the city of Columbus attached which averred that a review of ordinances passed by the city council in the years 1951 and 1952 did not reveal:

"* * * any ordinance or resolution passed by City Council of the City of Columbus whereby City Council either authorized the Board of County Commissioners to vacate a 30 foot strip of the right-of-way of East North Broadway lying within the City of Columbus, or gave their consent to the vacation of such strip by the County Commissioners."

The formal entry of judgment overruling the city's motion for summary judgment was filed August 31, 1971, which ruling was attacked by a motion to expunge. Such motion failed to impede the progress of the cause through to the decision and judgment stage, in the course of which there were three hearings before the trial court.

A decision of the trial court was rendered September 28, 1973, and filed October 1, 1973. It contained findings of fact and conclusions of law by the trial court, and an order restraining the city of Columbus and the department of highways of the state of Ohio "from using the two 15 foot strips of land" for highway purposes. These essentials are incorporated in the formal journal entry of the court, filed November 19, 1973, which is the judgment from which this appeal is taken.

The conclusions of law set out by the trial court in its "decision," and noted in its journal entry, provide the statutory and constitutional background for the present controversy. The city bottoms its contention on Article XVIII, Section 3 of the Constitution of Ohio, which reads as follows:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

The trial court reaches its conclusion by way of the provisions of R. C. 5553.02, which reads, in part, as follows:

"The board of county commissioners may locate, establish, alter, widen, straighten, vacate, or change the direction of roads as provided in sections 5553.03 to 5553.16, inclusive, of the Revised Code. This power extends to all roads within the county, except that as to roads on the state highway system the approval of the director of highways shall be had. * * *"

The trial court states, in paragraph three of its decision, with respect to the relatedness of the constitutional to the statutory provisions, and as the basis of its conclusion, the following:

"The 1952 action by the Commissioners was a legally effective vacation of a portion of East North Broadway, a county road, as the General Assembly expressly gave such power to the commissioners by R. C. Sec. 5553.02. As R. C. Sec. 5553.02 is a part of the general law of the state, being a matter of statewide concern involving situations with effects beyond the boundaries of municipal corporations, it constitutes an Article XVIII, Section 3 'general laws' exception to the powers of municipal corporations."

At this juncture, it may be useful to call attention to what also may well be another "general law" with respect to the authority of a municipality in the control of its streets. R. C. 723.01 reads as follows:

"Municipal corporations shall have special power to regulate the use of the streets. The legislative authority of such municipal corporation shall have the care, supervision, and control of public highways, streets, avenues, alleys, sidewalks, public grounds, bridges, aqueducts, and viaducts within the municipal corporation, and shall cause them to be kept open, in repair, and free from nuisance."

The predecessor to R. C. 5553.02 was G. C. 6860, made effective the first Monday in January 1928. This section

become a subject of inquiry early, as to the force of language employed. This is evident since the statute was the subject of a lengthy opinion of the attorney general issued January 26, 1928 (1 Op. Ohio Atty. Gen. 198, 1928), within a month after it became effective. The attorney general calls attention to the anomolous fact that there were two versions of G. C. 6860 passed by the legislature in the same session.

One version, and the one which influenced the present statement of the law is found in 112 Ohio Laws 430, which has a purpose clause reading as follows: ''To revise the laws relating to the department of highways and the state highway system and to amend sections * * *.''

Listed among the amended sections is G. C. 6860. The language employed concerning the power of the county commissioners is essentially the same as that quoted *ante*, from R. C. 5553.02.

The Senate version, in S. B. 68, approved by the Governor, May 3, 1927, and filed May 4, 1927, became effective by rule; that is, 90 days after being signed by the Governor. This bill carried a purpose clause, as follows:

''To amend sections 6860, 6862, 6864, and 6869 of the General Code, relative to the locating, establishing and vacating of streets, or alleys, outside of municipalities.''

The first portion of the section is essentially the same as that quoted from the house version with a significant addition, as follows:

''The power extends to all roads within the county, except the inter-county and main market roads. The county commissioners shall have the further power to alter, widen, straighten, vacate or change the direction and name of streets and alleys on any dedicated plat lying without the corporate limits of any municipal corporation.''

It will likely never be known why the two versions differ. But, in any study of the legislative ''intent'' in enacting the law, it cannot be argued that the senate intended to give the county power over ''streets'' within a municipality. Incidentally too, it should be noted that the broad powers granted to county commissioners in G. C. 6860, and in other

related sections refer only to the term "road" or "roads" and never "streets."

The other sections amended in the Senate version of powers bestowed warrant notice. G. C. 6862 outlines procedural steps to be taken in accomplishing a change in a public road, including vacation. It begins by requiring the petition by 12 freeholders residing in the vicinity of the proposed change to be filed, and notice of the time of the viewing and hearing to be given. Finally, a resolution to make the improvement, covered in G. C. 6864, has to be made. These sections are predecessors to R. C. 5553.04 and 5553.05.

G. C. 6869, presently R. C. 5553.10, provided for the appropriate records respecting the improvement, or change to be entered in the proper road records by the county engineer. The section further provides:

"* * * If the proceeding be one for the vacation of a road, the commissioners shall order said road vacated, and the same shall cease to be a public road."

If there has been a change or alteration, then "[t]hat part of the road, if any, made unnecessary by any change or alteration therein shall be ordered vacated." These provisions appear in present laws in essentially the same form as to the language employed. Again, it is noteworthy that the word "street" does not appear in any section noted—always the term is "road."

According to 57 Ohio Jurisprudence 2d 804, Words and Phrases, Road (see also 27 Ohio Jurisprudence 2d 16, Highways and Streets, Section 2), the word "road," as ordinarily used in Ohio statutes, relates to public ways and rural sections while the word "street" is used as to roadways in a municipal corporation.

The trial court in the instant case relies heavily upon the authority granted to counties in R. C. 5553.02. In that section, the court states, the General Assembly:

"* * * expressly granted power to counties to vacate county roads, including county roads which after annexation run through city boundaries. R. C. Sec. 5553.02, as implemented by the state through boards of county commis-

sioners, is part of the general law of the state and is an exception to the grant of powers to municipal corporations under Article XVIII, Section 3 of the Ohio Constitution."

This observation makes it necessary to note that the General Assembly has spoken frequently and voluminously with respect to highways, roads, and streets. To look only at R. C. 5553.02 is to risk overlooking other essential statutory provisions. Attention is directed to pertinent statutes and to decisions which are related thereto.

Annexation procedures rest with county commissioners where residents in a territory adjacent to a municipal corporation seek to become a part of that corporate area. R. C. 709.02 provides the method and authority for annexation. It reads, in pertinent part, as follows:

"The owners of real estate adjacent to a municipal corporation may, at their option, cause such territory to be annexed thereto, in the manner provided by sections 709.03 to 709.11, inclusive, of the Revised Code. Application for such annexation shall be by petition, addressed to the board of county commissioners of the county in which the territory is located, signed by a majority of the owners of real estate in such territory. Such petition shall contain:

"(A) A full description and accurate map or plat of the territory sought to be annexed;

"(B) A statement of the number of owners of real estate in the territory sought to be annexed;

"(C) The name of a person or persons to act as agent for the petitioners."

The authority of county commissioners in annexation matters is essentially complete. A decision in *Powers* v. *County Commrs. of Wood County* (1858), 8 Ohio St. 285, involves land in the county sought to be annexed to Perrysburg. This early decision held that a vote of the citizens of the annexing municipality created no rights and that the county commissioners must determine the public policy factor in any annexation.

In *Blanchard* v. *Bissell* (1860), 11 Ohio St. 96, it was determined that annexation can be ordered without the consent of a majority of the residents of the territory to be

annexed, and that the order of the county commissioners accomplishes the joinder, as a result of which all of the rights and liabilities existent in the municipal corporation accrue to the persons in the territory.

Other legislative enactments determine the consequences of annexation. When annexation is complete, according to R. C. 709.20:

"* * * such territory is a part of the annexing municipal corporation, and the inhabitants residing in the territory shall have all the rights and privileges of the inhabitants residing within the original limits of such municipal corporation."

That effective annexation occurs promptly, and is complete is attested to by the decision in *Williams* v. *Village of Deer Park* (1946), 78 Ohio App. 231, a case in which the county issued a building permit the day before annexation, and the permit as issued would not support a request for an injunction against the annexing municipality, the property involved having become amenable to the controlling city ordinance upon annexation.

Any error appearing in the annexing procedure is not fatal if the annexed territory has been recognized as a part of the annexing municipal corporation, taxes have been levied and paid, and the territory has been subjected to municipal authority. (R. C. 709.21.)

R. C. 711.04 and 711.041 direct the formal creation and recording of the plat of a subdivision, the latter section dealing particularly with "lands outside a municipal corporation" and the limitations on the effect of approval by the county commissioners.

As to the approval or rejection of plats and the adoption of rules to regulate them, R. C. 711.05 speaks. A portion of that section needs special attention. It provides that a board of county commissioners:

"* * * may adopt general rules and regulations governing plats and subdivisions of *land falling within its jurisdiction,* to secure and provide for the coordination of the streets within the subdivision with existing streets and roads or with existing county highways * * *."

The emphasized part indicates the limits to the author-

ity of the county, where the "coordination" of "streets within the subdivision" (possibly within a village) with existing streets, roads, and county highways is undertaken.

R. C. 711.06 provides the specifications for a subdivision in a municipal corporation. This statute speaks as though the municipal corporation was unrelated to the county, or subdivisions of land "within its jurisdiction." In this connection, it should be noted that R. C. 711.09 specifically provides that the planning commission of a municipality may anticipate and reach beyond the corporate limits of the municipality, a distance of three miles in its planning program.

Specifically now, as to streets and their status upon the annexation of a subdivision outside the municipal borders, R. C. 711.07 must be seriously regarded. It reads as follows:

"Upon recording, as required by section 711.06 of the Revised Code, the plat shall thereupon be a suffiicient conveyance to vest in the municipal corporation the fee of the parcel of land designated or intended for streets, alleys, ways, commons, or other public uses, to be held in the corporate name in trust to and for the uses and purposes set forth in the instrument."

The municipality gets "the fee" to land "designated or intended for streets" to be held "in trust," for the uses and purposes set forth in the instrument; that is, the plat— the purposes being its use as streets and so forth.

The basic character of the municipal corporation as a "trustee" is reflected in the decisions of Ohio courts where municipalities have vacated streets and alleys and the courts have linked that corporate act to the necessary conclusion that property owners then benefit from the abandonment of the tract. Such a decision is found in *The Kinnear Manufacturing Co.* v. *Beatty* (1901), 65 Ohio St. 264.

A similar decision, of similar vintage, appears in *Callen* v. *The Columbus Edison Electric Light Co.* (1902), 66 Ohio St. 166. The holding there is that the "title" to land

dedicated by a proprietor who subdivides is in the municipal corporation "for the use of the public for street purposes." The decision of the Supreme Court in *Greenberg* v. *The L. I. Snodgrass Co.* (1954), 161 Ohio St. 351, follows the decision in *Kinnear*. These are instances in which the municipality accomplished the vacation.

There is a more recent *nisi prius* decision dealing with the very modern phenomenon of cable television, which follows the classic cases. In *DiBella* v. *Village of Ontario* (1965), 4 Ohio Misc. 120, the basic rule is found in paragraph 1 of the syllabus, as follows:

"A municipality holds fee title to the entire street, in trust to the uses for which it was dedicated." (See, also, *The Louisville & Nashville Railroad Co.* v. *Cincinnati* (1907), 76 Ohio St. 481.)

This "trust" concept is firmly established in decision law. The significance of the concept must not be overlooked. If the municipality be a trustee and the street the object, or corpus, of the trust, it would appear to be absolutely necessary to consult the trustee before any other person, or body politic could limit, destroy, or otherwise dispose of the object of the trust.

R. C. 717.01 specifically defines the powers of a municipal corporation with respect to streets, and states that "Each municipal corporation may:

"(P) Open, construct, widen, extend, improve, resurface, or change the line of any street or public highway."

The scope of these powers is broadened in R. C. 717.04, which states that the municipal corporation may do things to "limited access highways" or "freeways," within its boundaries, in the same manner as such may be done to a street, including "vacate" it.

R. C. Chapter 723 is devoted to the powers and duties of municipal corporations with regard to its streets and public grounds. R. C. 723.01, titled "Legislative authority to have care, supervision, and control of streets," reads, as follows:

"Municipal corporations shall have special power to regulate the use of streets. The legislative authority of such

municipal corporation shall have the care, supervision, and control of public highways, streets, avenues, alleys, sidewalks, public grounds, bridges, aqueducts, and viaducts within the municipal corporation, and shall cause them to be kept open, in repair, and free from nuisance."

The power to vacate is spelled out in R. C. 723.04, as follows:

"The legislative authority of a municipal corporation, on petition by a person owning a lot in the municipal corporation praying that a street or alley in the immediate vicinity of such lot be vacated or narrowed, or the name thereof changed, upon hearing, and upon being satisfied that there is good cause for such change of name, vacation, or narrowing, that it will not be detrimental to the general interest, and that it should be made, may, by ordinance, declare such street or alley vacated, narrowed, or the name thereof changed. The legislative authority may include in one ordinance the change of name, vacation, or narrowing of more than one street, avenue, or alley."

It should be noted at this point that the city of Columbus has provided in section 188 of its charter for the doing of any of the things enumerated in the aforementioned section and in addition it provides for the apportionment of the cost of the improvement contemplated.

That these sections, as noted, are controlling as to streets is emphasized by the fact of the existence of speci· fic legislation dealing with "roads." There are classes of highways noted and defined in R. C. 5535.01, to wit: "state roads, county roads, and township roads." R. C. 5541.01 covers county highway systems, and the powers of the county commissioners as to the roads included in the system. This is the chapter in which the troublesome language relating to the power of the county commissioners appears. Such states that the board's powers "extend to all roads within the county."

It should be noticed, at this point, that the statutory provisions to which reference has been made, as to the vacating of county roads, existed at least nine months prior to the adoption of the municipal home rule constitutional pro-

vision (Article XVIII, Section 3), on September 3, 1912. Page and Adams Annotated Ohio General Code, section 6915, provides this information. This compilation of Ohio statutes reflects all of the laws of a general nature enacted through January 1, 1912. Thus, the statute authorizing the county commissioners to vacate roads existed in substantially the same form prior to the adoption of the Ohio home rule amendment, and such statute was not enacted subsequent to the adoption of that home rule amendment.

There must be cooperation, of course, between and among the bodies politic since the state, the county, and the city are all concerned with the development of highway systems. The statutory basis for that cooperation is spelled out in R. C. Chapters 5511 and 5521, the latter dealing in particular with municipal and county cooperation.

Certain areas of necessary cooperation have been recognized by court decision. For example, *City of Zanesville* v. *Zanesville Canal & Mfg. Co.* (1953), 159 Ohio St. 203, involved two town lots in the city of Zanesville, shown on the recorded plat as dedicated for "market house" purposes, in which the General Assembly of the Northwest Territory vested title in Muskingum County. The lots became a part of the city. In such situation, the Supreme Court held that the county was an interested and necessary party to an action commenced by the city of Zanesville for a declaratory judgment. Not to make the county a party was a jurisdictional defect. The suit caused the court to recognize that cooperation between the city and county is necessary, but it should not be overlooked that the action involved public land and not a street within a municipality.

This background discussion brings us now to the very nub of the problem presented. The decision of the trial court seems to center on one fundamental principle as it relates to Article XVIII, Section 3, of the Ohio Constitution. The language used by the trial court is as follows:

"As R. C. Sec. 5553.02 is a part of the general law of the state, being a matter of statewide concern involving situations with effects beyond the boundaries of municipal corporations, it constitutes an Article XVIII, Section 3

'general laws' exception to the powers of municipal corporations.''

An analysis of the noted constitutional section indicates two separate and distinct phases of the power of a municipality. First, the provision states: ''Municipalities shall have authority to exercise all powers of local self-government.'' Second, it relates, a municipality shall have power: ''To adopt and enforce within their limits such local police, sanitary and other similar regulations as are not in conflict with general laws.'' It is local police, sanitary and similar ''regulations'' to which the limiting clause ''not in conflict'' applies.

To put the matter directly, in question form, the query is: Is the vacation of a street within the corporate limits of a municipality an exercise of the power of self-government or the adoption of a police, sanitary or similar regulation? It is admitted that there is no easy, readily available, and wholly convenient answer to the query.

The new home rule amendment was troublesome to the members of the constitutional convention of 1912, as is indicated by delegates' comments as they puzzled about the connotation of the terms local self-government and the conflict with the general law. Proposed new concepts meant a change from the then prevailing rule that a city could do only that which was specially conferred by statute upon the municipality. Thus, the following comments:

''* * * Therefore this proposal undertakes pretty nearly to reverse that rule and to provide that municipalities shall have the power to do those things which are not prohibited * * *. So the presumption would now become a presumption in favor of the lawfulness of the municipalities' act, and that presumption would only be overcome by showing that the power had been denied to the municipalities or that it was against the general laws of the state.'' (2 Ohio Constitutional Convention 1912, ''Proceedings and Debates,'' 1433.)

The purpose intended by the convention appears to have been:

''* * * to confer upon the cities for the benefit of those

who live in the cities control over those things peculiar to the cities and which concern the cities as distinct from the rural communities." (2 Ohio Constitutional Convention 1912, *supra.*)

Commenting on the change of policy as proposed to the convention and emphasizing the new philosophy of "home rule," the chairman of the committee to which this particular constitutional change was assigned speaks as follows:

"** * the law now presumes that no function not distinctly enumerated by the general assembly can be exercised by the municipality. This section, if I am correctly informed, would reverse that principle entirely. It would assume that all functions not specifically denied—local functions I refer to—could be exercised by the municipality, and, of course, that is the essence of home rule." (2 Ohio Constitutional Convention 1912, *supra* at 1458.)

The home rule concept, "powers of local self-government," and the matter of the conflict between "local police, sanitary and other similar regulations," and the general law, have produced a huge volume of decision law. It is beyond the realm of possibility to review all such decisions, but some significant ones will be noted.

A good starting point in this limited review of decision law is found in *Babin* v. *City of Ashland* (1953), 160 Ohio St. 328. This decision is of particular interest to this discussion since it deals with a "town" which, under the then existing law, lodged the title to its public grounds in the county, as the agent for the state. Upon the incorporation of the "town" that title was transferred to the incorporated town, according to the Supreme Court. Paragraph six is the part of the syllabus of interest here. At page 350, however, the court elaborates upon the rule, as follows:

"Therefore, our conclusion is that the powers of local self-government, vested in Ashland by Section 3 of Article XVIII of the Ohio Constitution, include the legislative power to dispose of the public rights of that portion of the public represented by the inhabitants of Ashland in land located in Ashland where such rights are disposed of

for a public purpose of interest and advantage to those inhabitants of Ashland * * *. In the instant case, there are no constitutional limitations which would prevent or limit such an exercise of that power. Neither does the Constitution give the General Assembly any authority to prevent or limit such an exercise of that power.* * *''

A decision of the Court of Appeals for Ottawa County, issued in the same year as the *Babin* decision, appears in *Zetzer* v. *Lundgard* (1953), 95 Ohio App. 51. The decision states the basic rule quite simply in paragraph three of the syllabus, as follows:

"Under the statutes of Ohio, the council of a village or city is authorized to vacate a street or a portion thereof whenever, in the exercise of its sound discretion, such action will not be detrimental to the public interest."

The court's summary of the basic facts, at page 58, which resulted in the legal action and which required the conclusion reached by the court, is of particular interest to us. It states:

"However, plaintiff has not claimed in this court that the several acts of council were void by reason of noncompliance with the statute, but does claim that the action taken was wholly without legal authority and, therefore, void and constructively fraudulent. This claim is grounded on the proposition that the Plat of the Town of Port Clinton was laid out by the owner of the land 'just out in the country,' and not as an addition to a municipality; and that the streets, alleys and areas 'intended for public use' were dedicated pursuant to the statute (29 Ohio Laws, 350, 351), and particularly with section 8 thereof, 'for the uses and purposes therein named, expressed or intended, and for no other use or purpose whatsoever.' "

Quite clearly, the fact that land outside a municipality, which subsequently becomes a part of the municipality, is platted does in no sense affect the authority of the corporate entity to vacate a street.

A much more recent decision of the second district Court of Appeals, dealing with the sale of a municipally owned public utility, is contained in *Korn* v. *Dunahue*

(1967), 13 Ohio App. 2d 46. Interestingly, this decision quotes from and relies upon the Supreme Court decision in *Babin, supra.* In supporting its decision that the municipality, the city of Miamisburg, had the right to operate under Section 3, Article XVIII, the Court of Appeals, quoting *Babin,* stated, at page 52:

" '6. The power to convey property owned by a municipal corporation and no longer needed by it for municipal purposes is included within the powers of local self-government conferred by Article XVIII of the Ohio Constitution.'

"On page 348 in the opinion, the court said:

" 'It is only necessary to determine that the legislative body of the city did not clearly abuse its discretion in determining that the city did not need "for any municipal purpose" that portion of the "public ground" which it proposes to sell.' "

See *City of Steubenville* v. *King* (1873), 23 Ohio St. 610; *Lawrence Railroad Co.* v. *Commrs. of Mahoning Co.* (1878), 35 Ohio St. 1; *The Louisville & Nashville Railroad Co.* v. *City of Cincinnati* (1907), 76 Ohio St. 481; *Billings* v. *Cleveland Railway Co.* (1915), 92 Ohio St. 478; *The Village of Perrysburg* v. *Ridgway* (1923), 108 Ohio St. 245; and, *Village of Beachwood* v. *Bd. of Elections of Cuyahoga County* (1958), 167 Ohio St. 369. See, also, *City of Steubenville, ex rel. Blackburn,* v. *Targoss* (1965), 3 Ohio App. 2d 21, particularly paragraph two of the syllabus; and, *Bd. of Education* v. *The Unknown Heirs of Aughinbaugh,* (1955), 99 Ohio App. 463, at its reference to *Babin,* at page 470.

These decisions provide an excellent illustration of what is included in, and is a proper exercise of "the powers of local self-government."

In a very recent decision, the Ohio Supreme Court considered the powers of local self-government granted to a municipality in Section 3, Article XVIII. In *Britt* v. *Columbus* (1974), 38 Ohio St. 2d 1, the court held that the power to exercise eminent domain beyond the geographical limits of the municipality is not encompassed in the powers

of local self-government. More particularly, the court said, at page 6:

"This court has never framed an all-inclusive definition of the term 'all powers of local self-government' appearing in Section 3 of Article XVIII."

However, at page 7, the court quotes from *Beachwood. supra*, apparently supplying what it said it had previously not done. In pertinent part, the quote reads:

" 'To determine whether legislation is such as falls within the area of local self-government, the result of such legislation or the result of the proceedings thereunder must be considered. If the result affects only the municipality itself, with no extra-territorial effects, the subject is clearly within the power of local self-government and is a matter for the determination of the municipality.* * *' "

It is the considered opinion of this court that the act of vacating a street is an exercise in local self-government. It is only "police, sanitary and other similar regulations" which may encounter a charge of conflict with general laws. Illustrative of the kind of a local ordinance which may run counter to general law is that found in the *Village of Struthers* v. *Sokol* (1923), 108 Ohio St. 263. The Supreme Court recognized the power of a municipality to enact political regulations, such as regulations concerning the manufacture and sale of intoxicating liquors. Clearly, these are police regulations. Paragraphs 2 and 3 of the syllabus in *Struthers* state:

"2. In determining whether an ordinance is in 'conflict' with general laws, the test is whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa.

"3. A police ordinance is not in conflict with a general law upon the same subject merely because certain specific acts are declared unlawful by the ordinance, which acts are not referred to in the general law, or because certain specific acts are omitted in the ordinance but referred to in the general law, or because different penalties are provided for the same acts, even though greater penalties are imposed by the municipal ordinance."

These rules make it clear that there is still latitude for the municipality even in regulation.

The question here for review involves an exercise in local self-government. Noted and cited case law supports that conclusion. The street was in the corporate limits of the city of Columbus. Title to East North Broadway was in the city, as trustee, and any attempt to dispose of it by vacating, in whole or in part, lies within the sound discretion of the legislative body of the municipality. For the county commissioners to attempt to vacate a portion of the street was an exercise in futility. Clearly the county could dispose of any interest it may have had in the street, but it had no jurisdiction as to the "fee title" held by the "trustee." Any action taken by the county commissioners was therefore a nullity.

There is no decision law on "all fours" with the present fact pattern in Ohio. Such is true largely because, to our knowledge, no county has had the audacity to attempt such a vacation. If such has happened, no legal action followed.

Appellant's assignments of error are well taken.

The judgment of the trial court is reversed and judgment is entered which the trial court could and should have entered, for the defendants and against the plaintiffs, dismissing the complaint with its prayer for a permanent injunction.

*Judgment reversed.*

HOLMES and STRAUSBAUGH, JJ., concur.

STRAUSBAUGH, J. concurring. The question presented by this appeal is complex because of the vagueness and lack of clarity of the applicable law. I do not agree that the action of the county commissioners "was an exercise in futility" or a "'nullity," unless qualified by the word "alone." Defendant city of Columbus admits, in paragraph one of its answer, that "East North Broadway is a duly dedicated public thoroughfare in the city of Columbus and

that said thoroughfare was originally dedicated as a county road in 1891.'' The vacation of a county road within a municipality, by the municipality under R. C. 723.01, is an exercise of local self-government, but not to the exclusion of the power of the board of county commissioners under R. C. 5553.02, where a public way has aspects of both a city street and a county road. In other words, insofar as a public way is a city street, the county commissioners have no jurisdiction to vacate although the city council would. Insofar as the same public way is a part of the county highway system and thus a county road, city council cannot vacate, but the county commissioners can.

The Supreme Court has held that a municipal council has no power to vacate that part of a county road which lies within the municipality. *Railroad Co.* v. *Cummins* (1895), 53 Ohio St. 683. By the same reason, a board of county commissioners *alone* does not have the power to vacate a county road within the municipality. Instead, joint or dual action by both legislative bodies is required.. This interpretation is compelled for the reason that otherwise, if a municipality and a board of county commissioners were antagonistic, a municipality could proceed to vacate by itself essential county roads within the city or, conversely, a board of county commissioners could vacate badly needed city streets within the municipality.

Single actions alone by the county commissioners cannot vacate a street within the municipality herein; therefore, the judgment must be reversed.